## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS

GALICANO ALEA,

          **Plaintiff**,

v.

SCOTT PTACEK and JULIAN GARCIA,

          **Defendants.**

Case No. 24-1147-DDC

## <u>MEMORANDUM AND ORDER</u>

Plaintiff Galicano Alea was walking his dog on a sidewalk adjacent to a public middle school.  He was fiddling with his phone to adjust his music selection.  But to defendant Julian Garcia, a police officer, it appeared that plaintiff was filming school children.  So, he detained plaintiff and demanded identification.  Plaintiff refused.  Officer Garcia eventually released plaintiff, who continued his walk.  Still on school property, plaintiff then encountered a second officer, defendant Scott Ptacek.  Officer Ptacek detained plaintiff and demanded identification.  When plaintiff refused, Officer Ptacek arrested him for interference with a law enforcement officer.  Six months later, prosecuting authorities dismissed all charges against plaintiff.  Plaintiff now has sued the officers for violating his Fourth Amendment rights.

Plaintiff asserts a § 1983 claim against Officer Garcia for unlawful detention.  And he asserts two § 1983 claims against Officer Ptacek—one for unlawful detention and one for unlawful arrest.  Defendants have filed a Motion for Summary Judgment (Doc. 32).  In it, they argue that they deserve qualified immunity.  The court disagrees.  No reasonable officer in defendants' shoes reasonably could have suspected plaintiff of engaging in criminal conduct.

Though plaintiff's conduct arguably appeared creepy, Officer Garcia, lacking reasonable suspicion, lacked a lawful basis for the detention. And Officer Ptacek lacked a lawful basis to arrest plaintiff for refusing identification. To hold otherwise would allow police officers to demand identification from anyone near a school while using a smartphone—parents taking first-day-of-school videos, a grandparent trying to pull up directions while in the school drop-off line, or dog walkers holding their phone near their chest. This Order thus denies defendants' Motion for Summary Judgment (Doc. 32).

## I.      Background

The parties don't dispute the following facts.[1]

Plaintiff is a resident of Garden City, Kansas. Doc. 29 at 2 (PTO ¶ 2.a.1.). He lives on a street adjacent to Horace Good Middle School. *Id.* (PTO ¶ 2.a.5.). Defendants are police officers employed by the City of Garden City. *Id.* (PTO ¶ 2.a.3., 4.). Two stops—both taking place the morning of Thursday, August 24, 2023—are relevant to this action. Earlier that morning, at a department roll call, Officer Garcia had heard that several callers over the weekend had reported someone recording kids at local swimming pools and parks. Doc. 33-3 at 4–5 (Garcia Dep. 16:19–17:8). Officer Garcia didn't have a description of the suspect. *Id.* at 5 (Garcia Dep. 18:15–19:1).

With the table set, the court now explains the circumstances involved in each of these police encounters.

---

[1]      The parties quip at one another about immaterial facts. *E.g.*, Doc. 33 at 4–5 (discussing plaintiff's subjective feelings about the events); Doc. 36 at 5 (asserting that plaintiff thought it "was stupid" that Officer Garcia detained him); *id.* (asserting that defendants' sergeant called plaintiff a "jackass"). The court has little interest in these sideshows. It thus confines its recounting of these events to facts material to the summary-judgment dispute.

A.      **First Stop**

Plaintiff was walking his dog on a public sidewalk adjacent to Horace Good Middle School.  Doc. 29 at 2 (PTO ¶ 2.a.7.).  At about 7:30 am, Officer Garcia was on traffic patrol in the school's vicinity during peak drop-off time.  *Id.* at 3 (PTO ¶ 2.a.8.).  Officer Garcia spotted plaintiff with his phone above his chest, which made him suspect that plaintiff was taking pictures of two children who were walking toward him.  Doc. 33-3 at 7 (Garcia Dep. 28:3–16); Doc. 29 at 3 (PTO ¶ 2.a.9.).  Plaintiff testified, however, that he was looking at the music on his phone.  Doc. 36-1 at 29 (Pl. Dep. 29:8–13).  Officer Garcia also observed that plaintiff had turned to face two juveniles after they had passed him.  Doc. 33-3 at 8 (Garcia Dep. 29:3–6).  So, Officer Garcia parked his vehicle, got out, and approached plaintiff.  Doc. 29 at 3 (PTO ¶ 2.a.9.).  Officer Garcia introduced himself and explained that he stopped plaintiff because it seemed like he was taking pictures of children.  *Id.* (PTO ¶ 2.a.10.); Doc. 33-1 at 00:17–00:23 (Def. Ex. A).  As depicted in the video capture below, this encounter occurred on a sidewalk adjacent to Horace Good Middle School.



Doc. 33-1 at 00:18 (Def. Ex. A).  Plaintiff explained that he wasn't taking pictures.  *Id.* at 00:26–00:27.  He even told Officer Garcia to check his phone.  Doc. 29 at 3 (PTO ¶ 2.a.11.).  Still, Officer Garcia demanded plaintiff's identification multiple times.  *Id.* (PTO ¶ 2.a.10.).  But plaintiff refused to provide it.  *Id.*  Officer Garcia informed plaintiff that he couldn't leave until Officer Garcia had identified him.  *See* Doc. 33-1 at 01:52–02:12 (Def. Ex. A).

Eventually, another officer, Sergeant Matt Cole, arrived on scene.  Doc. 29 at 3 (PTO ¶ 2.a.13.).  He spoke with plaintiff briefly and then told him he was free to go.  *Id.*  After this first encounter, Officer Garcia contacted Officer Ptacek and relayed what had transpired.  Doc. 33-3 at 14 (Garcia Dep. 55:17–56:15).

### B.     Second Stop

Minutes later, Officer Ptacek encountered plaintiff with his cell phone out, near his chest. Doc. 29 at 3 (PTO ¶ 2.a.14.).  As shown in the video-screen capture below, this encounter also occurred on a sidewalk in front of Horace Good Middle School.



Doc. 33-5 at 0:16 (Def. Ex. E).  Officer Ptacek demanded plaintiff provide his name and date of birth—multiple times.  Doc. 29 at 3 (PTO ¶ 2.a.15.).  When Officer Ptacek told plaintiff he

looked like he was filming kids, plaintiff held up his phone and said, "You can check this." Doc. 33-5 at 02:00–02:04 (Def. Ex. E). Officer Ptacek threatened to arrest plaintiff if plaintiff refused to comply with his demand for identification. Doc. 29 at 3 (PTO ¶ 2.a.15.). Plaintiff refused. *Id.* Plaintiff insisted, "I walk here every day." Doc. 33-5 at 2:50–2:56 (Def. Ex. E). Officer Ptacek then announced that plaintiff was under arrest and handcuffed him. *Id.* at 4 (PTO ¶ 2.a.16.).

Officer Garcia transported plaintiff to the Garden City Police Department and cited him for violating a provision of the Garden City municipal code that prohibits interfering with a law enforcement officer. *Id.* (PTO ¶ 2.a.17.). Six months later, the city attorney dismissed the charge against plaintiff. *Id.* (PTO ¶ 2.a.18.).

Plaintiff now brings this lawsuit against defendants for violating his Fourth Amendment rights. Plaintiff asserts three § 1983 claims: one against Officer Garcia for detaining him during the first stop; one against Officer Ptacek for detaining him in the second stop; and one against Officer Ptacek for arresting him. *Id.* at 13 (PTO ¶ 4).[2]

## II.        Legal Standard

Summary judgment is appropriate where the moving party demonstrates there is "no genuine dispute" about "any material fact" and that the movant is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). This standard dictates that the court "view the evidence and make inferences in the light most favorable to the non-movant." *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010) (citing *Oldenkamp v. United Am. Ins. Co.*, 619 F.3d 1243, 1245–46 (10th Cir. 2010)).

---

[2]        Plaintiff initially asserted these latter two claims against Officer Garcia, as well. Doc. 29 at 13 (PTO ¶ 4). He since has withdrawn these claims as they apply to Officer Garcia. Doc. 36 at 15 n.1.

"An issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "An issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense." *Id.* (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

The moving party bears "'both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law.'" *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)). To carry this burden, the moving party "'need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim.'" *Id.* (quoting *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)). Even if the non-moving party fails to respond adequately, "the district court may not grant the motion without first examining the moving party's submission to determine if it has met its initial burden of demonstrating that no material issues of fact remain for trial and the moving party is entitled to judgment as a matter of law." *Reed v. Bennett*, 312 F.3d 1190, 1194–95 (10th Cir. 2002).

If the moving party satisfies its initial burden, the non-moving party "'may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial [on] those dispositive matters for which it carries the burden of proof.'" *Kannady*, 590 F.3d at 1169 (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 248–49. The specific "facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Libertarian Party of N.M. v. Herrera*, 506 F.3d 1303, 1309 (10th Cir. 2007) (citing *Adler*, 144

F.3d at 671).  Affidavits and testimony "must be based upon personal knowledge and set forth

facts that would be admissible in evidence; conclusory and self-serving affidavits are not

sufficient."  *Tucker v. Faith Bible Chapel Int'l*, 36 F.4th 1021, 1030–31 (10th Cir. 2022)

(quotation cleaned up).

Federal courts don't view summary judgment as a "disfavored procedural shortcut."

*Celotex*, 477 U.S. at 327.  Instead, it represents an important procedure "designed 'to secure the

just, speedy and inexpensive determination of every action.'"  *Id.* (quoting Fed. R. Civ. P. 1).

### III.        Analysis

The court organizes its Order in this fashion.  The Order begins by laying out the law

governing qualified immunity.  Then, the court addresses whether defendants deserve qualified

immunity against plaintiff's two detention claims.  It concludes with a qualified-immunity

analysis for plaintiff's arrest claim.

### A.        Qualified Immunity Background

"The doctrine of qualified immunity protects government officials 'from liability for civil

damages insofar as their conduct does not violate clearly established statutory or constitutional

rights of which a reasonable person would have known.'"  *Pearson v. Callahan*, 555 U.S. 223,

231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Once a defendant has

"asserted the defense of qualified immunity, the burden is on Plaintiffs to establish their right to

proceed."  *Matthews v. Bergdorf*, 889 F.3d 1136, 1143 (10th Cir. 2018).  A qualified-immunity

analysis has "two prongs:  whether the facts suffice to show a legal violation and whether that

law was clearly established at the time of the alleged violation."  *Clerkley v. Holcomb*, 121 F.4th

1359, 1363 (10th Cir. 2024) (quotation cleaned up).

The court now applies this standard to plaintiff's § 1983 claims, starting with the ones

based on defendants detaining him.

**B.    Detention Claims**

Plaintiff asserts that both defendants violated his Fourth Amendment rights when they stopped him on the sidewalk as he walked his dog and demanded to see his identification.  Under the Fourth Amendment, a police officer "may conduct an investigatory stop, or 'Terry stop,' if he 'has a reasonable suspicion supported by articulable facts that criminal activity may be afoot[.]'" *United States v. Huerta*, No. 25-1050, 2025 WL 3018105 (10th Cir. Oct. 29, 2025) (published) (quoting *United States v. Samilton*, 56 F.4th 820, 827 (10th Cir. 2022)).  But "'absent some reasonable suspicion of misconduct, the detention of' an individual simply to determine his identity violates that individual's 'Fourth Amendment right to be free from an unreasonable seizure.'"  *Mglej v. Gardner*, 974 F.3d 1151, 1163 n.9 (10th Cir. 2020) (quoting *INS. v. Delgado*, 466 U.S. 210, 216 (1984)).

"For reasonable suspicion to exist, an officer need not rule out the possibility of innocent conduct; he or she simply must possess some minimal level of objective justification for making the stop." *United States v. Ulibarri*, 149 F.4th 1193, 1198 (10th Cir. 2025) (quotation cleaned up).  "Reasonable suspicion is a low bar; evidence falling considerably short of a preponderance satisfies this standard." *Id.* (quotation cleaned up).  This standard, while not onerous, "squarely demands something more than an inchoate and unparticularized suspicion or hunch[.]" *Bustillos v. City of Artesia*, 98 F.4th 1022, 1028 (10th Cir. 2024).  "Reasonable suspicion is based on the totality of the circumstances." *Huerta*, 2025 WL 3018105, at *4 (quotation cleaned up).

Before the court applies this standard to this case's summary judgment facts, it must resolve the parties' disagreement about a governing-law issue.  According to defendants, they didn't need reasonable suspicion of a specific crime so long as they harbored reasonable suspicion that "criminal activity [was] afoot in a general sense[.]"  Doc. 37 at 4.  In their view,

they could stop plaintiff if they thought he was up to no good and they need not articulate what law, exactly, he'd violated.

Circuit precedent suggests just the opposite. As already stated, "[i]nchoate suspicions and unparticularized hunches do not provide reasonable suspicion." *United States v. Simpson*, 609 F.3d 1140, 1147 (10th Cir. 2010). So, to detain plaintiff and demand his identification, defendants needed reasonable suspicion of a *specific* crime. *See Bustillos*, 98 F.4th at 1028 (rejecting argument that harboring "generalized suspicions *something* was amiss" sufficed (emphasis in original)). That is, "law enforcement needs reasonable suspicion of a predicate, underlying crime, not a generalized suspicion a person is simply up to no good, to support an arrest for concealing identity." *Id.* (quotation cleaned up); *see also Corona v. Aguilar*, 959 F.3d 1278, 1283 (10th Cir. 2020) (explaining that a "demand" for ID is lawful only if the officer "possessed reasonable suspicion that Plaintiff had committed or was committing a crime").[3]

Here, defendants offer just one crime to support their reasonable-suspicion position: reckless stalking as defined by Kan. Stat. Ann. § 21-5427(a)(1). Doc. 33 at 17–18. The court thus confines its analysis to whether defendants had reasonable suspicion that plaintiff was committing reckless stalking, as defined in Kan. Stat. Ann. § 21-5427(a)(1). *See Bustillos*, 98 F.4th at 1029 n.7 (finding it "entirely reasonable" for the district court to "confin[e] its analysis

---

[3]    Even if the court considered the issue through defendants' preferred lens, its conclusion wouldn't change. As the court explains, below, plaintiff's conduct didn't suggest *any* criminal activity, much less a specific crime. And no reasonable officer could have believed that plaintiff was committing sexual exploitation of a minor or trespassing—the other crimes defendants identified in their depositions. Doc. 33-3 at 8 (Garcia Dep. 30:6–10); Doc. 33-4 at 8 (Ptacek Dep. 32:3–14). Sexual exploitation of a minor requires sexually explicit conduct, and children walking to school can't meet that standard. Kan. Stat. Ann. § 21-5510(d)(1). And an element of criminal trespass is an order to vacate the premises; an intruder-notifying posting, lock, or fence; or a restraining order. Kan. Stat. Ann. § 21-5808(a)(1); Garden City, Kan. Mun. Code § 62-2(m)(a)(1). No officer reasonably could have suspected the existence of these critical elements. So, no reasonable officer could have harbored reasonable suspicion that plaintiff was committing either of these crimes. At bottom, plaintiff was walking his dog on a public sidewalk with his phone out. That conduct doesn't suggest that crime—of any kind—was afoot.

to the crimes [defendant] identified").  And defendants rely on the same arguments to justify both stops.  *See* Doc. 33 at 26–27.  So, the court analyzes plaintiff's two detention claims together.

### 1.    Constitutional Violation

The court begins with the first qualified-immunity prong:  whether defendants violated plaintiff's constitutional rights.

Defendants seized plaintiff during both encounters.  Officer Garcia implied that plaintiff wasn't free to leave.  And Officer Ptacek threatened plaintiff with arrest.  A reasonable person in plaintiff's situation wouldn't have felt free to leave either encounter.  *See United States v. Gaines*, 918 F.3d 793, 796 (10th Cir. 2019) (explaining that a seizure occurs when "a reasonable person would [not] have felt free to leave or terminate the encounter").  Thus, these encounters were lawful only if defendants had reasonable suspicion.

Defendants lacked reasonable, articulable suspicion that plaintiff was committing, had committed, or was about to commit a crime.  As the court has explained, the sole crime that defendants claim they reasonably suspected plaintiff of committing is reckless stalking.  The Kansas code defines this crime as:

> Recklessly engaging in a course of conduct targeted at a specific person which would cause a reasonable person in the circumstances of the targeted person to fear for such person's safety, or the safety of a member of such person's immediate family and the targeted person is actually placed in such fear[.]

Kan. Stat. Ann. § 21-5427(a)(1).  Defendants identify three factors they contend supported reasonable suspicion:  the weekend reports about someone photographing children at pools and parks; plaintiff walking near the school during drop-off hours; and plaintiff ostensibly filming children.  Doc. 33 at 17, 26–27.  The court considers each fact, in turn, below, then considers all three of them together.

### a.    Weekend Reports

Defendants cite the Thursday morning briefing, where Officer Garcia heard about over-the-weekend reports that someone had recorded children at pools and parks.  Doc. 33 at 17, 19.  As defendants concede, Officer Garcia did not recall anything about the suspect—*i.e.*, gender, race, ethnicity.  *Id.* at 2.  This report—of facially lawful activity occurring at least four days before defendants detained plaintiff—adds nothing to the reasonable-suspicion calculus.

The reported suspect—with no identifying information—plausibly described anyone with a smartphone.  Law enforcement can't use such an "unparticularized" report to support reasonable suspicion.  *Samilton*, 56 F.4th at 827 (quotation cleaned up).  As the Supreme Court explained long ago, "circumstances describ[ing] a very large category of presumably innocent" people can't form reasonable suspicion.  *Reid v. Georgia*, 448 U.S. 438, 441 (1980) (per curiam); *see also United States v. Guerrero*, 472 F.3d 784, 788 (10th Cir. 2007) (explaining that officer's reasonable-suspicion justifications were "so broad as to be indicative of almost nothing").  Even in the defendants' world—one in which plaintiff had engaged in conduct similar to that of the weekend recorder—plaintiff's conduct merely was "theoretically consistent" with the reported weekend recorder, someone Officer Garcia knew nothing about.  *United States v. Martinez*, 910 F.3d 1309, 1316 (10th Cir. 2018).  But filming public pools and parks—while arguably creepy—isn't illegal.  And theoretical consistency with reports of lawful activity "doesn't add any specific and articulable facts" to defendants' suspicions that plaintiff was committing a crime.  *Id.*

In short, the report of a weekend recorder was "supergeneric," described "innocuous" activity, and didn't connect to plaintiff—or anyone one specific person for that matter.  *United States v. Daniels*, 101 F.4th 770, 778 (10th Cir. 2024).  It thus contributes little to defendants' purported reasonable suspicion.  *See id.* (discounting the weight of a 911 call to totality of the

circumstances "because of the call's supergeneric, innocuous nature and because [defendant] himself was not described in it").

### b.    Near School

Defendants next cite plaintiff's proximity to a middle school during the start of the school day as a factor supporting their reasonable suspicion.  Doc. 33 at 17, 26.  A suspect's location may constitute a relevant factor for the reasonable-suspicion calculus.  *See United States v. Young*, 99 F.4th 1136, 1145 (10th Cir. 2023) (explaining that "the fact that the stop occurred in a high crime area is among the relevant contextual considerations in a *Terry* analysis" (quotation cleaned up)).  That said, location *alone* can't supply reasonable suspicion.  *Id.*  And none of our Circuit's cases discussing location suggest that proximity to a school can suggest criminal activity.  Instead, those cases say that proximity to a high-crime area may bear on the reasonable-suspicion inquiry.  But here, defendants haven't adduced any evidence that the school or surrounding community were prone to crime.

Defendants argue that schools are particularly sensitive locations warranting special treatment.  Doc. 33 at 15–16.  Indeed, some courts have supported such a proposition.  In one of the cases defendants cite, the Fourth Circuit explained that the "fact that school grounds constituted the location of the unknown individual's suspicious activity would immediately heighten a reasonable officer's concern[.]"  *United States v. Coleman*, 18 F.4th 131, 136 (4th Cir. 2021).  But *Coleman* involved circumstances far more suspect than those here.  There, a school administrator contacted the school resource officer after finding "an unknown man . . . parked erratically" on a high school's campus.  *Id.* at 133.  The administrator reported that the individual "was asleep or passed out" and illegally parked in a travel lane "with a crossbow visible in the backseat."  *Id.*  *Coleman* concluded that the officer had reasonable suspicion that the individual was trespassing.  *Id.* at 138.  In so concluding, the Fourth Circuit cited a school board policy

requiring visitors to identify themselves and a Virginia statute requiring school visitors to vacate the premises upon a command. *Id.* at 137. And the analysis relied heavily on the school administrator's report to the police.

*Coleman* says little that matters to the current case. Defendants haven't argued plaintiff was trespassing. Nor have they argued that any school board policy or Kansas statute required plaintiff to identify himself absent independent reasonable suspicion. Nor did anyone call the police to report plaintiff. Regardless, *Coleman* merely suggests that officers might remain particularly vigilant against crime on school grounds when "arriv[ing] on scene to a report of an unauthorized individual and unusual activity on school grounds[.]" *Id.* It doesn't suggest that proximity to a school renders the reasonable-suspicion inquiry toothless. Putting it simply, citizens don't forfeit their Constitutional rights simply by walking on sidewalks, smartphone in hand, adjacent to schools. So, this proximity-to-a-school factor adds minimally to the totality of defendants' purported reasonable suspicion.

### c.    Filming

The thrust of defendants' argument is that they thought that plaintiff was filming children. While filming children from a public vantage seems ill-advised or unsavory, it isn't—without more—criminal. Nor does it generate reasonable suspicion.[4]

---

[4]    The court invited the parties to submit supplemental briefs addressing this question: "Whether the First Amendment protects filming on public sidewalks adjacent to public schools such that this conduct can't qualify as a "course of conduct" under Kan. Stat. Ann. § 21-5427(f)(1) and thus can't support a reckless stalking conviction under Kan. Stat. Ann. § 21-5427(a)(1)." Doc. 38. Plaintiff's brief missed the point, failing to advance any argument that filming in public is constitutionally protected conduct. *See* Doc. 39. Defendants ably briefed the issue, offering a compelling argument that any First Amendment protections wouldn't preclude qualified immunity. *See* Doc. 41. Though, in the court's view, plaintiff's alleged conduct—filming from a public sidewalk—arguably was protected under the First Amendment, the court "will not craft a party's arguments for him." *Perry v. Woodward*, 199 F.3d 1126, 1141 n.13 (10th Cir. 1999). The court thus doesn't rely on the First Amendment when reaching this Order's conclusions.

Defendants rely on *State v. Loganbill*, 518 P.3d 437 (Kan. Ct. App. 2022), for their proposition that filming children may support a stalking conviction. Doc. 33 at 18–19; Doc. 37 at 8. But the facts of *Loganbill* are far worse, and thus too far afield to support defendants' position. There, a fourth-grade teacher surreptitiously and repeatedly recorded one of his student's buttocks. *Loganbill*, 518 P.3d at 439–41. By March of the school year, the teacher had accumulated 210 photos and 31 videos of the student's buttocks. *Id.* at 441. The Kansas Court of Appeals affirmed the conviction, explaining that "secretly photographing and filming a targeted person repeatedly may constitute a course of conduct proving stalking" under the Kansas stalking statute. *Id.* at 450 (quotation cleaned up).

The differences between *Loganbill* and this case abound. In Kansas, reckless stalking has three elements:

> (1) that the accused stalker recklessly engaged in a course of conduct targeted at a specific person;
>
> (2) that a reasonable person in the targeted person's circumstances would fear for his safety, her safety, or a family member's safety based on the accused stalker's course of conduct; and
>
> (3) that the targeted person was "actually placed" in fear for his safety, her safety, or a family member's safety based on the accused stalker's course of conduct.

*Id.* at 444–45. When using these elements to compare the *Loganbill* facts to the summary judgment facts here, *Loganbill* collapses under the weight defendants' arguments place on it.

The *Loganbill* defendant filmed the student over several months, which certainly qualifies as a course of conduct. Here, however, defendants make the dubious claim that they reasonably could suspect plaintiff engaged in a course of conduct—defined as "two or more acts over a period of time, however short"—by walking by students with his phone out, then turning around as they passed. Doc. 33 at 19. The court rejects this theory. Plaintiff's alleged filming qualifies as just one act, insufficient to qualify as a "course of conduct" under the reckless

stalking statute.  *See* Kan. Stat. Ann. § 21-5427(f)(1).  Regardless, plaintiff's alleged conduct is a far cry from surreptitiously taking 210 photos and 31 videos of a single student over months. Defendants had zero basis to believe that plaintiff had targeted the children who passed him or engaged in multiple acts targeted at those children.  No reasonable officer could think that plaintiff engaged in a course of conduct targeted at a specific person.

Defendants also have a problem with the fear elements.  The Kansas stalking statute requires both that the target subjectively harbor safety fears and that those fears are objectively reasonable.  Kan. Stat. Ann. § 21-5427(a)(1); *see also State v. Kendall*, 331 P.3d 763, 769 (Kan. 2014) (explaining that the "requirement that the victim be placed in fear and that such fear be reasonable suggests" that no liability inheres where victim is unaware of purported stalking activities), *abrogated on other grounds by State v. Barnes*, 563 P.3d 1255 (Kan. 2025).  In *Loganbill*, the intimate teacher-student relationship supported the objective reasonableness of the fear for safety the student experienced.  *See Loganbill*, 518 P.3d at 457 (explaining that defendant's grooming of victim justified her fear).  The prolonged duration of the filming also made the student's fear objectively reasonable.  *Id.* at 452 ("A.A.'s fear was objectively reasonable because the evidence showed that Loganbill had a designed plan to secretly photograph and film A.A.'s buttocks over an extended period during her school year in a way that reasonably caused A.A. to fear for her safety.").

Here, in contrast, plaintiff—so far as defendants knew—had no relationship with any of the students he encountered.  Nor had plaintiff targeted any of those students over any protracted period of time.  No reasonable person—including children—would harbor fear for their *safety* merely because someone was recording them on a public sidewalk on a single occasion.  True enough, having a camera pointed at you might generate uncomfortable or unpleasant feelings.

But it doesn't suggest a threat to *safety*. After all, "anything in a public place can be recorded and given circulation by means of a photograph." *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1218 (10th Cir. 2007) (summarizing a commentator's position in dicta). To accept defendants' argument on this fear element would allow them to detain virtually any person who films another person on suspicion of reckless stalking. Nor did defendants ever observe any subjective reaction from the children plaintiff ostensibly was recording. *See* Doc. 33-3 at 7 (Garcia Dep. 28:17–24). So the officers had no reason to believe the children subjectively feared for their safety—a necessary element of stalking. *See* Kan. Stat. Ann. § 21-5427(a).

To be sure, reasonable suspicion doesn't require officers to muster evidence of each element of an offense. *United States v. Rodriguez*, 739 F.3d 481, 488 (10th Cir. 2013). But the fear requirement is the keystone element of Kansas's stalking statute. *See State v. Whitesell*, 13 P.3d 887, 901–02 (Kan. 2000) (explaining that fear element limits Kansas's stalking statute to conduct not protected by the First Amendment). Without any reason to believe the children plaintiff ostensibly filmed feared for their safety, and without observing conduct that would cause an objectively reasonable person to fear for their safety, the officers lacked reasonable suspicion that plaintiff was engaged in criminal conduct.

In sum, defendants' mistaken belief that plaintiff was filming juveniles adds close to nothing to the reasonable-suspicion calculus. Without more, plaintiff's conduct was too innocuous to suggest stalking.

### d.    Reasonable Suspicion – Totality of the Circumstances

While each individual factor fails to support reasonable suspicion, courts mustn't engage in a "divide-and-conquer analysis" of reasonable-suspicion factors. *United States v. Arvizu*, 534 U.S. 266, 274 (2002). So, the court now must determine whether the factors defendants cite supported—in the aggregate—reasonable suspicion. They didn't. Individually or collectively,

the factors defendants cite fail to generate reasonable suspicion. Defendants saw an older man walking on a public sidewalk with his phone out. True, plaintiff was walking near a school and plausibly held his phone in a manner suggesting he was recording juveniles. Even so, that conduct doesn't suggest crime. At best, the officers were "amorphously suspicious," which won't do. *Gonzalez v. Brunnemer*, No. 24-1200, 2025 WL 3296031, at *3 (10th Cir. Nov. 26, 2025). The Fourth Amendment's protections don't depend on how high a citizen holds his phone. So, even viewed collectively, the facts defendants cite—the weekend reports of an adult filming children, the proximity to a middle school, and the ostensible filming—don't generate reasonable suspicion of criminal activity. At bottom, plaintiff had his phone out and was walking on a public sidewalk. This legally innocuous behavior doesn't generate reasonable suspicion.

For comparison in a slightly different context, consider *United States v. Dell*, 487 F. App'x 440 (10th Cir. 2012). There, defendant and his companion were in a high-crime area, looking into the windows of a parked car. *Id.* at 444. When they noticed an officer approaching them, they walked away from the parked car. *Id.* Our Circuit found no reasonable suspicion. *Id.* at 447. It attributed little weight to the officer's high-crime description of the area. *Id.* at 446. And it explained that peering into a vehicle's window was "innocuous and so very much in the realm of ordinary behavior that it would not lead a reasonable officer to suspect that a car break-in had occurred or was about to occur." *Id.* The Circuit acknowledged that "if a break-in was happening, the observed conduct would almost necessarily be a part of that sequence of events." *Id.* But the same conduct couldn't support reasonable suspicion because "it *also* occurs at many other times when *nothing* illegal is happening." *Id.* (emphasis in original).

This same principle applies here.  In theory, holding a phone at chest height in public might contribute a small fraction to conduct qualifying reckless stalking.  But that same conduct "occurs at many other times when *nothing* illegal is happening." *Id.* (emphasis in original).  At bottom, defendants' position is that they stopped plaintiff "based on their belief that *no one* should be" on school grounds with their phone at chest height.  *Gonzalez*, 2025 WL 2396031, at *3 (emphasis in original).  "But this is no more than a generalized hunch." *Id.*  And such a belief doesn't support reasonable suspicion.

Because they detained plaintiff and demanded identification without reasonable suspicion of a crime, the officers violated plaintiff's Fourth Amendment rights.  *See Mglej*, 974 F.3d at 1163 n.9.  The court thus progresses to the second prong of the qualified-immunity inquiry: whether this violated right was clearly established.

### 2.    Clearly Established

A constitutional right is clearly established when, "at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful.  In other words, existing law must have placed the constitutionality of the officer's conduct beyond debate." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (quotation cleaned up).  A plaintiff can't defeat qualified immunity "simply by alleging violation of extremely abstract rights," *White v. Pauly*, 580 U.S. 73, 79 (2017), and a court shouldn't "define clearly established law at a high level of generality," *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011).  At the same time, our Circuit's "case law does not require a scavenger hunt for cases with precisely the same facts to clearly establish a constitutional violation." *Krueger v. Phillips*, 154 F.4th 1164, 1201 (10th Cir. 2025) (quotation cleaned up).

The reasonable-suspicion standard is well established and decades old.  The Supreme Court has held that officers can't rely only on "an inchoate and unparticularized suspicion or

hunch" to supply the requisite reasonable suspicion. *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quotation cleaned up). And more than 40 years ago, the Supreme Court explained that the Fourth Amendment prohibits officers from detaining people and demanding identification without reasonable suspicion. *Brown v. Texas*, 443 U.S. 47, 53 (1979). Reasonable officers in defendants' position would have known that a man walking his dog on a public sidewalk next to a school while on his phone doesn't give rise to reasonable suspicion. These facts, considered in their totality, give rise to nothing more than a hunch, which is insufficient.

In *Bustillos v. City of Artesia*, our Circuit held that police officers had violated clearly established law by demanding plaintiff's identification where plaintiff had filmed an oil refinery from public property. 98 F.4th 1022, 1025–26, 1034–35 (10th Cir. 2024).[5] There, the Circuit held that the officers had no reasonable basis to suspect plaintiff of trespassing, disorderly conduct, potential terrorist activity, or loitering and prowling. *Id.* at 1029–34. So, they had no lawful basis to demand his identification. *Id.* The Circuit concluded that its caselaw provided the arresting officer with "fair warning than an arrest for concealing identity without reasonable suspicion of a predicate, underlying crime violates the Fourth Amendment." *Id.* at 1035 (quotation cleaned up).

So too here. It was clearly established in *Bustillos* that the police lacked reasonable suspicion to demand the identification of a man filming while walking the perimeter of a refinery. The court thus concludes that it was clearly established that the officers here lacked

---

[5]       The Circuit published *Bustillos* after the underlying facts in this case, which, at first blush, would seem to preclude *Bustillos* from clearly establishing the law in this case. But the underlying facts of *Bustillos* occurred in September 2018, before the date of the facts underlying this case. *See* 98 F.4th at 1025. So, *Bustillos* is instructive because it describes the state of clearly established law as of September 2018. *See Wilkins v. City of Tulsa*, 33 F.4th 1265, 1276 n.8 (10th Cir. 2022) (explaining that "a case decided after the incident underlying a § 1983 action can state clearly established law when that case ruled that the relevant law was clearly established as of an earlier date preceding the events in the later § 1983 action." (quotation cleaned up)).

reasonable suspicion to demand plaintiff's identification for allegedly filming while walking the perimeter of a school.

Striving to avoid this outcome, defendants cite *Gonzalez v. Huerta*, 826 F.3d 854 (5th Cir. 2016). There, plaintiff sat in his vehicle in an elementary school parking lot, waiting for his spouse—a teacher at the school—to finish work. *Id.* at 855. Another school "employee noticed his vehicle, deemed it suspicious, and contacted the school district police[.]" *Id.* "While en route," defendant—a school district police officer—"received additional information regarding a history of vehicle burglaries at the same location, although no evidence connected any of these prior incidents to" plaintiff's vehicle. *Id.* at 856. Defendant approached the vehicle and ordered plaintiff to produce identification. *Id.* When plaintiff declined, defendant arrested him and held him for over 30 minutes in his patrol vehicle before releasing him. *Id.* Plaintiff sued under § 1983 for illegal detention, false arrest, and excessive force. *Id.* Defendant asserted qualified immunity, which the district court granted at summary judgment. *Id.* at 855–56.

A divided Fifth Circuit panel affirmed, relying on the clearly established prong of qualified immunity. The majority started with its "serious doubts" about "whether [defendant] had a reasonable basis to detain" plaintiff. *Id.* at 857. The majority went on, all but finding a constitutional violation. As the majority acknowledged, "the bare report of a 'suspicious' vehicle" added little to the reasonable-suspicion calculus. *Id.* And the history of burglaries at the location didn't connect to plaintiff or his vehicle. *Id.* Any suspicion defendant could have harbored should have dissipated with plaintiff sitting idly in his own vehicle, with his daughter in the back seat. *Id.* As the majority put it, "no real inference of criminal activity can be drawn from the totality of these facts and circumstances." *Id.*

20

The court pauses here to note that *Gonzalez* actually hurts—not helps—defendants. Out-of-Circuit authority can clearly establish law. *See Irizarry v. Yehia*, 38 F.4th 1282, 1296 (10th Cir. 2022). And *Gonzalez* concludes that the officer responding to a report lacked reasonable suspicion to demand plaintiff's identification on school grounds where the officer had no information connecting a suspicious vehicle to burglaries in the area. *Gonzalez*, 826 F.3d at 857. Here, defendants had even less than the *Gonzalez* officers. No one called the police to report plaintiff. He wasn't loitering on school grounds. He was walking by them. And the alleged information about filming children at a swimming pool didn't occur at the school. The court acknowledges that one out-of-Circuit case can't clearly establish law, but it persuades the court to treat defendants' arguments with serious skepticism. Put differently, if the Fifth Circuit back in 2016 didn't find reasonable suspicion on facts even more suspicious than those presented here, then why were the defendants here so certain that they could demand plaintiff's identification?

Returning to *Gonzalez*, the majority affirmed granting qualified immunity based on the second qualified-immunity prong, concluding that no clearly established law placed plaintiff's detention squarely in objectively unreasonable territory. *Id.* And the majority concluded that plaintiff's view of the clearly established right—that police can't demand identification without reasonable suspicion—defined the right too generally. *Id.* at 857–58. Also significant to the majority's clearly established analysis, was the location of the detention on school property. *Id.* at 858. Defendant's decision to detain plaintiff "was based, at least in part, on his belief that [plaintiff] was required to identify himself" under a Texas statute. *Id.* The majority emphasized that no Supreme Court case addressed a refusal to provide identification on school property, and Supreme Court precedent has often constrained the scope of Fourth Amendment rights in the school setting. *Id.* (compiling Supreme Court cases).

Here, the court reaches a different conclusion because it has cases like *Bustillos*. *Bustillos* considered the question of a "uniquely sensitive setting" and found that such a setting doesn't definitively answer the reasonable-suspicion inquiry. 98 F.4th at 1031–32. And *Bustillos* based its analysis on *Mocek v. City of Albuquerque*, which emphasized the sensitivity of airport security checkpoints. 813 F.3d 912, 924 (10th Cir. 2015). Put differently, in this Circuit, it is clearly established that a uniquely sensitive area—like a school or an oil refinery or airport security checkpoints—must weigh into the totality of the circumstances. But it's also clearly established that, for Fourth Amendment purposes, a sensitive area is not a decisive factor. This consideration simply wasn't present in *Gonzalez*.

Returning to *Gonzalez*, the court notes that the dissenter, Circuit Judge James Graves argued that the majority's approach made "the qualified immunity analysis so fact-specific that it would never be clearly established." *Id.* at 859 (Graves, J., dissenting). He explained that the officer's detention "was objectively unreasonable in light of clearly established law." *Id.* at 859–60. And he highlighted Supreme Court precedent that "has definitively held that a police officer may not detain an individual he deems suspicious solely for refusing to provide identification, even under a state statute and in a neighborhood frequented by drug users, without reasonable suspicion." *Id.* at 860 (citing *Brown*, 443 U.S. at 51–52).

If it didn't rely on the distinction between the caselaw in this Circuit and the Fifth, the court would still deny qualified immunity because it finds the *Gonzalez* dissent more persuasive—and more in line with Tenth Circuit authority—than the majority. As the *Gonzalez* majority seemed to acknowledge, Fourth Amendment protections don't dissipate when people cross a school's property line. In the court's view, any reasonable officer would understand that

point.  Regardless, this case is distinguishable from *Gonzalez*.  No one had reported that plaintiff was suspicious or causing an issue.

On this summary judgment record, defendants don't deserve qualified immunity.  It is clearly established that reasonable suspicion doesn't exist when a citizen is walking on a sidewalk with a smartphone held at chest height.  In short, no reasonable officer in defendants' shoes reasonably could have suspected that plaintiff was about to commit, was committing, or had committed the Kansas crime of reckless stalking.

The court next turns to plaintiff's arrest claim.

### C.    Arrest Claim

Officer Ptacek doesn't deserve qualified immunity on plaintiff's arrest claim, either.  The Fourth Amendment "does not permit an officer to arrest someone for concealing identity without 'reasonable suspicion of some predicate, underlying crime.'"  *Corona*, 959 F.3d at 1283 (quoting *Keylon v. City of Albuquerque*, 535 F.3d 1210, 1216 (10th Cir. 2008)).  Because—as the court has explained already—Officer Ptacek lacked reasonable suspicion that plaintiff was engaged in criminal activity, he had no lawful basis to demand identification from plaintiff.  *See* Kan. Stat. Ann. § 22-2402(1) (permitting an officer to demand identification only when the "officer reasonably suspects" the person "is committing, has committed[,] or is about to commit a crime").  And clearly established law prohibits officers from arresting someone for concealing their identity when the officer lacks "reasonable suspicion of some predicate, underlying crime." *Keylon*, 535 F.3d at 1216; *Corona*, 959 F.3d at 1283 (reiterating this rule).  The court thus denies Officer Ptacek's request for summary judgment against plaintiff's Fourth Amendment claim based on his arrest.

IV.    Conclusion

The summary judgment record—viewed in the light most favorable to plaintiff—suggests that defendants ran roughshod over plaintiff's Constitutional rights.  Because no reasonable officer in their shoes reasonably could have suspected that criminal activity was afoot, defendants don't deserve qualified immunity.  They unlawfully detained plaintiff and demanded identification.  And Officer Ptacek unlawfully arrested plaintiff for failing to furnish identification.  The court thus denies defendants' Motion for Summary Judgment (Doc. 32).

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant Julian Garcia and Scott Ptacek's Motion for Summary Judgment (Doc. 32) is denied.

**IT IS SO ORDERED.**

**Dated this 16th day of December, 2025, at Kansas City, Kansas.**

s/ Daniel D. Crabtree
**Daniel D. Crabtree**
**United States District Judge**